STATE OF IOWA, Appellee, v. JOE ROBINSON, Appellant.

CRIMINAL LAW: Other Offenses—Admissibility—Rape. Evidence
1  of offenses other and different than the specific one charged in the indictment, and each a complete offense in itself, is admissible on the question of *quo animo*, even though such offenses were not directly committed by the accused, and though subsequent in point of time to the offense charged, when in view of time, place, and circumstances the offense charged and such other offenses are so interwoven that they all constitute one criminal transaction.

CRIMINAL LAW:    Trial—Argument—Misconduct—Inflammatory
2  Appeals—New Trial. The law does not shackle a public prosecutor with a handicap in the way of a hard and fast rule as to just what he may and just what he may not say in argument. But however repulsive the crime may be, however self-evident the guilt of the accused may appear, the public prosecutor should always remember that to keep within the record and fair and reasonable deductions therefrom is the high ideal of the law and his proudest boast. Aside from this high ideal of the law, he should remember that assertions during argument that he or someone else would have been justified in taking the law into his own hands and killing the accused (or words to that effect) are regarded as highly inflammatory and are very destructive to the stability of a verdict of guilt. In the instant case, a new trial was ordered, because of inflammatory remarks, in spite of the admonition of the trial court to the jury not to consider the same.

RAPE: Corroboration—On What Phase of Case Necessary. Corrobo-
3 ration is only necessary in so far as it is necessary to connect
the defendant with the commission of the offense. The com-
mission of the crime may be proven by the testimony of the
prosecuting witness.

RAPE: Force and Resistance—Mental and Physical Strength of
4 Parties—Instructions. It was proper, in instant case, to instruct:
"You are instructed that the force necessary, on the one hand,
to commit the crime of rape, and the resistance required, on the
other hand, to constitute the crime, depend upon the relative
mental and physical strength of the parties, and the circum-
stances surrounding them at the time of the alleged assault,"
even though there was no record evidence of the physical and
mental strength of the parties, both, however, being before the
jury.

CRIMINAL LAW: Flight in Absence of Accusation—Effect of—In-
5 structions. In instant case, the effect of flight, if the jury found
any, on the part of accused, was properly left to the jury, even
though at the time of leaving accused had not been charged
with the offense.

*Appeal from Lyon District Court.*—HON. WM. HUTCHINSON,
Judge.

THURSDAY, MAY 13, 1915.

APPEAL from a judgment of conviction for the crime of
rape.—*Reversed.*

*E. C. Roach* and *D. H. Sullivan,* for appellant.

*George Cosson,* Attorney General, for the State.

GAYNOR, J.—Defendant in this case was charged and
convicted of the crime of rape committed upon one Bena
Runge on or about the 10th day of May, 1913, in the City
of Rock Rapids, County of Lyon. From the conviction, he
appeals to this court.

The first error assigned relates to the action of the court
in permitting the prosecuting witness to testify that other
parties, on the same night and about the same time, assaulted
her and had sexual intercourse with her.

The defendant admits that he had sexual intercourse with the prosecuting witness at the time, but claims that this was with her consent. He claims that he had intercourse with her twice on this day, once at the dump grounds during the afternoon, and once near the German Church in the evening. She, however, claims that there was but one act of sexual intercourse between her and the defendant, and this was in the evening, somewhere up town, the exact place she is not able definitely to fix. She says: "It was after we got across the railroad bridge. I do not know how far we went, and did not know where we were. After we got out across the railroad bridge, he threw me down and had connection with me. I cried and started to holler, and he never paid any attention to that. I kicked and tried to pull away so as to keep him away from me, but I could not do so. After that, he let me walk along again and Creglow came along and did the same thing. I scratched and tried to holler, and they never paid any attention to what I said, and then Creglow left and Robinson, the defendant took me along with him to the Fairgrounds. Then he took me in the barn at the Fairgrounds and here made me sit down on the bed. When I got to this barn there were seven men there. The room by the barn was quite a small one, and had a bed in it."

Thereupon, the following testimony was admitted over the objection of the defendant:

Q. And then what was done? Robinson was there, was he? A. Yes, sir. Q. And then what was done, Bena? What did they do to you then, if anything? A. And then they all went out, all but Slim. Q. Slim? A. Yes, and he stayed in there. And then he had connection with me. Q. Well, what did you do when he tried to have connection with you? A. Scratched and hollered. Q. And then what happened after that? A. Then he left the room and another one came in. Q. And what did he do? A. He tried the same thing. Q. And what did he do? A. He left the room with-

out. Q. He left the room without? A. Yes, sir. Q. You kept him from it, did you? A. Yes, sir. Q. Did anybody else come in? A. Yes, sir. Q. Do you know who that was? A. Frank. Q. That is all you know? A. Yes, sir. Q. A fellow by the name of Frank? A. Yes, sir. Q. And what did he do, if anything? A. He did the same thing as Slim did.

And then they all went out and I stayed there and then they all came back together and sat down. I think when they came back there were nine of them altogether, including Creglow and Robinson. And then they all talked together and two others came to the door and then two of them went out and they talked to those people on the outside and then they came in, too. Then Robinson and Jack Creglow took me out and Slim came afterwards. Robinson and Creglow took me away from the barn. Joe Robinson said that if I would tell anything about this he would find it out and kill me. This was said at the barn and I was scared. Do not know how long I was in the barn but it seemed a long while to me. After we left the barn Robinson and Creglow took me to the end of the fairgrounds. They both took a hold of me and kept a hold of me until we got to the gate of the Fairgrounds. Then Slim came and Creglow let go of me and Slim took a hold of me the same way that he did. I had never seen or heard of Slim before that night. After Slim took a hold of me, they took me to the wagon bridge, one on either side of me. When we got to the bridge, Robinson let go of me and Slim led me along. This all occurred at Rock Rapids in Lyon County, Iowa.

Q. What did Slim do with you, Bena? A. Led me into the house. After Robinson left, Slim led me to a house. Q. Now, I want to ask you whether or not Robinson came to that house at all, that you know of? A. No, sir.

She further testified that she did not see Creglow after he had intercourse with her until she saw him down in the room at the Fairgrounds.

She further testified that Slim was a large man; that she had no acquaintance with him prior to this meeting; that when Slim took her into the house, the location of which she is unable to state, he made her undress and made her get into bed. He put the light out. Then he came into the bed. She says she tried to get out, but he kept her there. When she attempted to get out, he made her lie down. She did not sleep any during that night; that he had sexual connection with her; that she tried to prevent him from doing so; that in the morning, Slim telephoned for a team; that the telephone was in a room other than the bedroom; that he locked her in the bedroom when he telephoned; that a team afterwards came; that Slim took her out and made her get into the buggy; that there was a man called Thomas in the buggy at the time; that Slim gave her a dollar about the time she started away; that he said nothing about money before that time. Slim was about twenty-seven or twenty-eight years old. This man Thomas took her away from the house to a wagon bridge, then made her get out. After she got out of the buggy, she went to get breakfast.

Defendant, testifying for himself touching the act of intercourse, said: "The place where I had connection with her in the evening was at the east side of the German Church. I had connection with her there once, but did not use any force. She was willing and consented to it. After that, I met some boys that I knew and talked with them. They asked who the girl was. I told them a lady friend of mine." He testified that when he got through with the boys he went over across the railroad track and turned north and went by the side of the factory until he got to the Rock Island tracks, and when he got as far as the depot, they met Creglow. While we were standing there, she said she thought she saw Mrs. Hamlin coming. "We went over to the Holliday machine shed. I stood there, she and Creglow did not stop, but kept on over to the shed. I stood there to see who those people were. While I was standing there Bena and Creglow came back. Then we

separated from Creglow.'' He then describes their route until they reached the Fairgrounds, about eight or nine o'clock. When they got there, they met Jack Creglow again. Thereafter, he details the meeting of certain parties and conversations between the prosecuting witness and himself and the others, about six in all, but denies that anyone had sexual intercourse with her at the Fairgrounds. After they had been in there awhile, he and Creglow went over to the well to get a drink and left the other parties there. They were gone fifteen or twenty minutes. The same crowd was in the room when they got back. Bena was sitting on the bed. When they got back, they stayed there about twenty minutes. Heard nothing about any abuse of Bena. They offered to take her to Hamlin's or to the preacher's where she had resided before. She said she wouldn't go. ''Then we told her we would get her a room at the hotel, but she didn't want to go there. After we started to leave the Fairgrounds, Slim overtook us. After Bena said she didn't want to go up town, Slim said she could go and stay with him and she said, yes, that she would go with him, and then Slim and Bena started south.'' Defendant says he accompanied them as far as the gate, but did not go to Slim's house; that immediately after Slim and Bena left, Creglow and he went up town. This was about 10:00 o'clock at night.

Creglow testified: ''I saw the prosecuting witness at the Fairgrounds that night with the defendant. I was in the habit of going down there quite frequently. We met these other men half way between the training barn and the west entrance, and we talked with them I should say five or ten minutes. Slim, or one of the parties, suggested going back to the barn, and we started back to the barn. When we got back to the barn, one of the parties opened the barn and we went in. Then we opened the office door and went to the office. This office contained a bed, chair, stove and table. While we were in there, we talked generally, Bena sitting on the bed. Nobody said anything improper or indecent to her,

and she was not assaulted. She appeared in good spirits and cheerful. Defendant and I stayed at the well twenty-five or thirty minutes getting a drink. When we returned, the same crowd was present. Bena was sitting on the bed in the same position in which we left her, and she said nothing to the effect that she wanted to get out. Rube was sitting in a chair in front of her. After sitting there a while, Joe and Bena and I went out together. We talked about taking her up town to Hamlin's where she could stay all night. We were about three hundred yards from the office when Slim came up and said, 'Where are you going?' We said, 'We are going to take her to Hamlin's.' She didn't say anything then, but afterwards said she didn't want to go there. Then we proposed to take her to the preacher's house. She said she didn't want to go there, but gave no reason. We then talked of taking her to the hotel. She didn't want to go there. Then Slim said, 'Well, she can go with me.' I don't remember what she did, but she went. I didn't see them any more that night.''

We have set out so much of the testimony as discloses the record made touching the matter complained of. The error assigned upon the admission of this testimony is as follows:

"In permitting the prosecuting witness, Bena Runge, over defendant's objections, to testify that Jack Creglow, on the night when it is claimed defendant assaulted her, had sexual intercourse with her up town, and also in permitting her to testify that on the same night one 'Frank' had intercourse with her in the barn on the Fairgrounds and that Lee Harper or 'Slim' had intercourse with her, both at the barn and at his house, the defendant not being present at any of said times, and said several acts of sexual intercourse being separate, distinct, and independent transactions.''

**1. CRIMINAL LAW: other offenses: admissibility: rape.**

This assignment of error is based upon the assumption that these were separate, distinct, and independent transactions, having no relationship to and in no way tending to

support the State's contention that the defendant committed the act charged to have been committed by him. Acts committed by others of a similar character to the one charged against him, when committed in his absence, have no probative force upon the issue tendered.

It is true, as a general proposition, that in a criminal case of any kind, it is not competent for the State to show the commission of other crimes, separate, distinct, and independent of the crime, even where the crime—the independent, separate, and distinct crime—was committed by the defendant himself, and much more certain it is that independent, distinct and separate crimes of a like character, committed by others, even upon the same person, are not, as a general rule, admissible against the defendant. But to these rules there are exceptions, and those exceptions have peculiar relevancy and force in this case.

If her story is true, and it was for the jury to say whether it was true or not, this defendant had, at the time of the meeting with this girl, a slight but friendly acquaintance. He took her from where he met her, under a pretense that he desired to communicate something to her, to tell her something. This was very early in the evening and then in the heart of the city. She walked with him, he having hold of her, to a lonely place. He then assaulted her against her will, and committed upon her the crime charged. Thereafter, he took her by a circuitous route, until he met the young man Creglow. From there he took her down to the machine sheds, in company with Creglow. He there stepped aside, and Creglow then committed the same act upon her as charged against this defendant. The defendant, still keeping her in his possession, if her testimony is true, still controlling her actions, for she said it was under protest, took her to this room at the Fairgrounds. There he met with these other friends of his. He and Creglow, having accomplished their purpose, went out from this room and left her there, they say to get a drink of water. She claims that, during their absence, she

was again ravished by two of these parties left with her in the room. From every act, from the first to the final act, when she was surrendered to the custody of Slim and he took her to his house, it would appear that the defendant was supervising and controlling her actions. If her testimony was true, Creglow and the defendant took hold of her, led her from the Fairgrounds and turned her over to the possession of Slim, who then, with their knowledge and apparent consent, if her story is true, took her to his home. Every fact is so closely related with the first fact that they cannot be said to be separate, distinct, and independent acts. .

In the case of the *State v. Hogan,* 145 Iowa 352, the defendant was charged with rape. The defendant was convicted, appealed and complained of the admission of evidence tending to show the commission of the same act by one Rohn shortly before the commission of the act by the defendant.. The court said: ''The testimony on behalf of the state tended strongly to show concerted action between Rohn and one Hausler and the defendant. The same offense was committed by each one in succession in a barn at the home of the defendant, and in the successive order above named. They were together at the barn shortly before the offense was committed by Rohn, and were together at the time it was committed by the defendant, and for some hours thereafter. Rohn procured the presence of the prosecuting witness at the barn. It is claimed on behalf of the defendant that Rohn's offense was entirely distinct and separate, and that it was committed before that of the defendant, and that it was, therefore, prejudicial to permit evidence of it. . . . It appears also from the evidence on behalf of the state that the offense was again committed by the defendant some hours later in the day at another place not far away. The state introduced its evidence concerning both of the alleged acts on the part of the defendant, and at the close of its evidence elected to rely upon the last.'' It was claimed in that case that this election further separated Rohn's act from the act upon which con-

viction was asked. The court said: ''If it were true, that the act of Rohn was separate and independent from that of the defendant, then the contention of the defendant as to its inadmissibility as evidence would be good. But, under the evidence on the part of the state, the act on the part of Rohn was so connected and related to the acts of the defendant that it was admissible as one of the surrounding circumstances of the case. Being admissible as such circumstance, the fact that it involved the commission of another crime did not render it inadmissible.''

As bearing upon this question see *State v. O'Connell,* 144 Iowa 559; *State v. Vance,* 119 Iowa 685; *State v. King,* 117 Iowa 484; *State v. Brady,* 100 Iowa 191; *State v. Desmond,* 109 Iowa 72.

The general rule is, that the State is not permitted, in its efforts to establish the crime charged, to introduce evidence of another substantive offense, but the rule is that, where the acts are all so closely related in point of time and place and so intimately associated with each other that they form one continuous transaction, the whole transaction may be shown, what immediately preceded and what immediately followed the act complained of, for the purpose of showing the *scienter* or *quo animo* of the party charged. This, it seems, is clearly true when, through the mist of it all, the jury can discern the presence and dominating character of the accused. Every fact, every circumstance surrounding the parties, attending their action, from the time of the meeting to the separation, is material to a proper understanding of their relationship, and has probative force in establishing their conduct towards each other.

Distinct, independent, substantive offenses, not related to the one charged, committed at different times or different places, cannot be shown against the defendant, but not so when the time, the place, the circumstances and the parties all have relation to and are directly or indirectly involved in the act

charged at the time of its commission or immediately before or after, and we think this is the doctrine of the cases cited.

We think the court did not err in the admission of this testimony.

It is next contended by appellant that the county attorney in his argument to the jury was guilty of misconduct. This error is assigned in the following language:

"Misconduct of the county attorney in making improper and prejudicial remarks to the jury in both his opening and closing arguments to the jury, and in which he attacked the character of the defendant, when it was not

2. CRIMINAL
LAW: trial:
argument:
misconduct:
inflammatory
appeals: new
trial.

in issue, and appealed to the passions and prejudices of the jury, declaring among other things, 'that if it had been my daughter instead of Bena Runge, this man would not be on trial here, but Simon Fisher would be on trial.' "

Unfortunately for us, the argument of counsel for the defendant was not taken down by the reporter, and is, therefore, not in the record of this case.

It is claimed by the State that much of the argument of the state's attorney, of which complaint is made, was in reply to statements made by defendant's counsel in their argument to the jury. The portions of the argument of the state's attorney, to which special attention is called and which are claimed to be highly inflammatory and not warranted by the record, are substantially as follows:

In the opening argument the counsel said: "This crime is infinitely more revolting than the taking of human life. If any of you have sisters—and some of you have—if any of you have daughters—and a number of you have—you would infinitely rather that your daughter would be slaughtered in cold blood than to have been treated as Bena Runge was on this night."

Again in speaking of Slim and Frank, he said: "But

they are both gone, and if they weren't gone, they would be sitting behind the table where Joe Robinson and Jack Creglow are, and if I retain my health and hold this office long enough, they are going to be there.''

Again, ''Gentlemen, I am frank to say that in the trial of a criminal case, I always try as hard as I can, to keep within the record, and even to be fair to the defendant, but in a case such as this, that touches the whole community, that touches the morals of the community, in a crime like this, where, if the defendant should go free every home is in danger, every virtuous girl that goes upon the streets of Rock Rapids or other villages in the county, are at the mercy of the ravisher. I say it is hard, gentlemen, in the argument of a case of this kind, to prevent yourself from injecting a little feeling into a case. I never can entirely detach myself from the thought that it might not have been Bena Runge that fell into the hands of these fiends. It might have been your daughter just as well—it might have been your sister— it might have been my daughter, and I thank God that it was not my daughter—you thank God it was not yours, because if it had been my daughter, this man would not be on trial here, but Simon Fisher would be on trial.''

At this point the court admonished Mr. Fisher and said, ''I think you are going too far, and the jury is cautioned not to regard that argument, and counsel is cautioned not to repeat it.''

Thereafter, counsel said in argument: ''She was in there like a caged bird, with no means of defense, as helpless as a little babe, at the hands of these men, and the surprise to me is, gentlemen, that there was not one man, one fellow there, at least one, that had left in him a spark of what you and I call manhood. Why gentlemen, in the wildest and wooliest days of the West, in the mining camps, out upon the ranges, anywhere, there is nearly always, even among the roughest of men, one fellow or more who has retained a spark of manhood, and if that child had been brought before them

and any man had threatened to violate her person, there would have been a gun drawn, and someone would have said, 'The first man who touches that girl dies,' but I am sorry to say you didn't find any of it in Rock Rapids that night, not a spark of manhood in any one of the men that were there. Why, gentlemen, I believe that there is not one of you—there is not a right thinking man anywhere, that, under such circumstances, would not have said, 'Before you violate the person of that girl, you will walk over my dead body.' That is what you would have said. You could not help but say it. When you think of your mother—when you think of your sister— when you think of your wife—when you think of your daughters, you could not help but have said it. No man could help but say that and do that, that has the least spark of manhood in his makeup, and yet they were all foul. Ah, gentlemen, it is a pity—it is a pity. I am sorry that such things can be done in so-called civilized communities, but they have happened.''

While the argument is set out in full in the abstract, the portions above set out are the only portions of which complaint is made.

We are invited to say that this was misconduct on the part of the counsel and reliance is had upon *State v. Proctor,* 86 Iowa 698; *State v. Helm,* 92 Iowa 540; *State v. Hasty,* 121 Iowa 507, 520; *State v. Harmann,* 135 Iowa 167; *State v. Fuller,* 142 Iowa 598; *State v. Hunt,* 144 Iowa 257.

Taking the cases in the reverse order, we find that *State v. Hunt, supra,* was an action for seduction, and it was complained that the prosecuting attorney, in his closing address, pointed to the child, then a mere infant, and declared it was all the evidence that any man would ask on the defendant's connection with the offense. The court said: ''This was, in effect, an exhibition of the child to the jury for the purpose of determining an alleged resemblance, and was seriously improper conduct on the part of counsel,'' and reference was made to *State v. Danforth,* 48 Iowa 43, and *State v. Harvey,*

112 Iowa 416. In the first case, it was held reversible error to exhibit the child to the jury for the purpose of determining a supposed resemblance. This action of counsel was held improper and a ground for reversal because it sought to introduce a factor into the case indirectly, which was not permitted to be done directly.

In *State v. Fuller*, 142 Iowa 598, counsel for the State said: "How many men are there whom you know, and whom I know, that, instead of going to a literary society and pulling John Fuller out by his coat collar would have gone and brought him out either with a club or a gun?" The court said: "We have often held that such remarks are sufficient to justify a reversal." This was a case in which the defendant was indicted and tried for the desertion of his wife.

In *State v. Harmann, supra,* defendant was tried and convicted of adultery. The counsel for the State in addressing the jury said: "Instead of trying a case of adultery here, Gentlemen of the Jury, you should be here for the purpose of determining whether or not Jacob Kiefer was guilty of murder if he had exercised his manhood and taken a gun or pistol and shot through the heart of Dr. Harmann." This court said: "There is enough of a disposition for unthinking and unreasoning persons to take the law into their own hands without having it encouraged by ministers of the law. It was the duty of the attorney who made this statement to discourage the very thing which he was countenancing, and there was no other reason for making the statement than to inflame the passions and induce the jury to right a supposed wrong which a party had neglected to perform on his own behalf. . . . It was improper for counsel to suggest such a remedy. The case in this respect is ruled by *State v. Proctor*, 86 Iowa 698, and *State v. Helm*, 92 Iowa 540, each of which is closely in point."

In *State v. Hasty, supra,*—this was an action for seduction —the attorney for the State said: "While I would not advise taking human life, Lemuel White would be justified in taking

the life of defendant.'' This court said: ''This was but the expression of the attorney's opinion of what White would have the right to do in the future, not of what he ought to have done, or should do. In this, it differs from *State v. Proctor.*'' This court further said in substance, ''When the remarks indulged in relate to a future course of conduct and do not pertain to the result of the trial, they can hardly be regarded as prejudicial, and especially is this true if not calculated to unduly arouse the passions of the jury or divert its attention from the proper discharge of its duty.''

The court, though expressing disapproval of the language used, and stating that it was unsound in law and opposed to modern notions of good morals, did not consider it sufficiently prejudicial to justify a reversal. It related rather to the opinion of what the attorney thought Lemuel White would be justified in doing in the future rather than to a statement as to what the jury should do in the particular case in avenging the wrong complained of; while in the case at bar, there was a direct appeal to the jury to do what counsel claimed anyone with a spark of manhood would do to avenge the wrong which counsel says should have been avenged, and which he would have avenged if it had been his daughter, by the taking of a human life.

It is impossible to lay down any hard and fast rule in matters of this kind, so much depends upon the character of the case, the nature of the remarks complained of, the disclosures made by the evidence, and the argument of counsel which preceded the argument complained of. We recognize the fact that it is difficult for counsel often, even in a fair and honest discharge of his duty, to so moderate his speech as not to, at least in some degree, appeal to the sympathy, prejudice, or even passion of the jury, and we do not want to be understood as even suggesting any fixed rule of limitation upon his rights in addressing the jury. Each case must be determined on its own facts, and in the light of the circumstances that attended the delivery of his address.

One elected to the office of county attorney, to represent the people in the prosecution of criminals, occupies a close relationship to the administration of the law and to the court, and should have no ambition beyond that laudable one to see that no guilty party escapes. But it is not for him to assume, as prosecutor, the guilt of the defendant at any stage of the proceedings. The defendant is presumed to be innocent until by the evidence he is shown to be guilty. The jury are empaneled and sworn to determine this question. Their judgment should be unbiased, unprejudiced, uninfluenced by any consideration other than the evidence submitted to them, and the law given to them by the court. Appeals to the passion, prejudice, or to the jury to stand up like men and show their disapproval of the crime charged, by convicting the defendant, are unauthorized and unjustified. Jurors are but human and respond humanly to those appeals. Called into the arena by counsel to condemn crime abstractly, and to show their manhood or lack of manhood in this manner, they are led into the trap that requires them to condemn the defendant to vindicate themselves. This is not the spirit of our law. This is not the purpose for which arguments to the jury are permitted. This is subversive of a fair administration of public justice. It is against the law and good morals.

We think, in this case, counsel went too far. Knowing counsel, we believe that he did this honestly, but in a mistaken zeal for the cause he had espoused. In view of this record, much of what was said by counsel in his argument had little to justify or support it.

It is next contended that there was insufficient corroborating evidence. We pass by this argument with the remark that a careful reading of the record satisfies us that there was abundant evidence of corroboration. The law requires corroboration only in so far as it is necessary to connect the defendant with the commission of the crime. The commission of the crime may be proven by the testimony of the prosecuting witness.

3. RAPE: corroboration: on what phase of case necessary.

Complaint is made of a portion of the twelfth instruction given by the court to the jury, in which the court said: "You are instructed that the force necessary on the one hand to commit the crime of rape, and the resistance required on the other hand to constitute the crime, depend upon the relative mental and physical strength of the parties, and the circumstances surrounding them at the time of the alleged assault."

4. RAPE: force and resistance: mental and physical strength of parties: instructions.

We think this instruction was justified by the record, although there was no direct testimony as to the mental or physical strength of either party. The parties were both before the jury, and the jury were competent to judge of that matter.

It is next objected that the court erred in instructing the jury in the fourteenth instruction given by the court, in which the jury were told that if they found from the evidence that the defendant fled from the town of Rock Rapids to avoid arrest and prosecution for the offense charged against him, "you may consider this evidence and the circumstances of his leaving, with all the other evidence and circumstances proven on the trial, and give to the evidence and circumstances attending defendant's departure from the State, such weight and credit as you believe it entitled to receive in determining the guilt or innocence of the defendant."

5. CRIMINAL LAW: flight in absence of accusation: effect of: instructions.

It is claimed that there was no evidence to justify this instruction, but it appears that the defendant left the state soon after the time when it is alleged that this crime was committed. It does not appear, however, that he had, prior to the time he left, been charged with the commission of the crime; but it is a very old saying that "Conscience does make cowards of us all," and further, "The wicked flee when none pursue." We think there was sufficient evidence to warrant this instruction.

For the errors pointed out, the case must be and is—
*Reversed.*

DEEMER, C. J., LADD, WEAVER, EVANS, PRESTON, JJ.,
concur. SALINGER, J., special concurrence.

SALINGER, J., concurring specially:

It appeared in testimony that defendant had connection
with prosecutrix against her resistance; that thereafter he
permitted her to walk away in his company; that they met one
Creglow, who then had intercourse with prosecutrix against
her resistance; that Creglow left, and that thereupon defend-
ant took her to a room with a bed in it, and situated on some
Fairgrounds; that when she arrived seven men were already
there—and it is a fair inference that Creglow was one of
these men.

As to what occurred while the girl was in this room and
thereafter, it was testified, over objection, that all the men
present, including defendant, left the room except one Slim,
who, after the others left, had connection with her against her
resistance; that thereafter Slim left the room and another
came in, who attempted connection but failed, and left; that
thereafter one Frank came into the room and forcibly had
connection with prosecutrix; that she was left alone for awhile,
and then all of the men came back and sat down and talked
together; that then two others came to the door, and two
went out and talked to them, and then the four returned.
Thereupon defendant and Creglow took her from this room
to the Fairgrounds, keeping hold of her in the meanwhile.
At this point Slim and Creglow let go of her, but Slim again
took hold of her, and thereupon Slim and defendant took her
to a wagon bridge, at which point defendant let her go, and
Slim held her alone. He took her alone to a house, and after
they arrived there, he made her undress and get into bed;
came into bed with her, and made her lie and remain there.

The indictment charges none of these acts, other than

the actual ravishment of prosecutrix by defendant, and it is urged on this appeal that it was error to admit this testimony as to what occurred subsequent to the alleged ravishment on part of defendant.

The opinion concedes that, as a general proposition, evidence of crimes other than the one charged in the indictment is inadmissible, even where the independent crimes were committed by defendant himself; and that this is, of course, true as to independent crimes of like character committed by others upon the same complainant. In sustaining the admission of this testimony, the opinion plants itself, as it must, upon the claim that there are exceptions which permit the testimony here complained of. I concede the existence of exceptions to the admitted rule, but am unable to agree that the testimony admitted is within any of them. The conditions of fact which are relied upon to make some of these exceptions applicable are stated thus:

1. Defendant used a false pretense to induce prosecutrix to go where he ravished her.

2. After accomplishing his purpose, he took her by a circuitous route until they met Creglow; that he took prosecutrix on in company of Creglow to some sheds, there stepped aside, and that then Creglow ravished her.

3. That because in going from the place where she was ravished by Creglow to the Fairgrounds, she went under protest; therefore, defendant still controlled her actions and kept her in his possession.

4. At the Fairgrounds he met a group of other men; he and Creglow left her in a room on the Fairgrounds, and during their absence she was again ravished by others, either left with her in that room, or who returned to it after having left.

5. That finally she was turned over to the possession of Slim, who took her to his home, kept her there all night and again ravished her.

It is said by way of deduction from these premises that,

"By every act, from the first to the final act, when she was surrendered to the custody of Slim, and he took her to his house, it would appear that defendant was supervising and controlling her actions. If her testimony was true, Creglow and the defendant took hold of her, led her from the Fairground, turned her over to the possession of Slim, who then with their knowledge and apparent consent, if her story is true, took her to his home."

"Through the mist of it all the jury can (could) discern the presence and dominating character of the accused."

I. This asserts that if, subsequent to the ravishment of prosecutrix by him, defendant was "supervising and controlling her acts," this makes the testimony which I challenge admissible within some of the exceptions to the rule.

Conceding, for the sake of argument, that proof of such domination makes some of the exceptions applicable, I am unable to see how the use of a false pretense to bring prosecutrix to the place where she was assaulted, or that Slim forcibly detained her in his house, proves that, subsequent to the ravishment by Slim, defendant "was supervising and controlling her actions." That there is other testimony which does establish such domination is immaterial on the point I am now discussing. Assume that the trial court proceeded rightly in receiving what tended to prove supervision and control, it was still error to admit testimony which does not tend to establish such supervision and control. As it is impossible to know upon just what testimony the jury based its verdict, I have no way of knowing whether, or to what extent, the verdict as a whole was controlled because of the evidence as to this false pretense, and this detention on the part of Slim. That proper evidence of dominance on the part of the defendant might be admissible as a basis for admitting other testimony, or admissible for any proper purpose, is no answer to having let in testimony which is inadmissible upon the theory advanced for its admission, or any other. Let the fact

of dominance be material and, therefore, proper evidence of it admissible, it was yet error to admit these two items. The admission of them should be held to constitute prejudicial error: first, because they show on their face that they tend to be injurious; and, second, because prejudice is presumed from the error in admitting them.

II. While it is at least debatable whether ravishment by others at which defendant connived establishes dominance on his part over the prosecutrix, it is manifest that one who himself rapes a female does exercise unlawful domination over her. Connivance at rape is, at its worst, no more than the equivalent of rape personally committed. Now if, as the opinion concedes, subsequent ravishment by defendant would, standing alone, not make such rape admissible, neither would conduct on his part, which is but the equivalent of a rape committed by him, make what his conduct connived at admissible, standing alone.

As I understand it, the majority realizes this, in that it does not put its holding on the naked fact that other rapes were committed with co-operation of defendant, but on the express ground that the acts were not separate and independent, and had probative force on the conduct of defendant and prosecutrix—which, if true, I concede, puts these acts within the exception to the rule. The opinion says:

"Every fact is so closely related to the first act that they cannot be said to be separate and independent acts. The general rule is that the State is not permitted, in its efforts to establish the crime charged, to introduce evidence of another substantive offense; but the rule is, that, where the acts are all so closely related in point of time and place and so intimately associated with each other that they form one continuous transaction, the whole transaction may be shown, what immediately preceded and what immediately followed the act complained of, for the purpose of showing the *scienter* or *quo animo* of the party charged. Every fact, every circum-

stance surrounding the parties, attending their action, from the time of the meeting to the separation, is material to a proper understanding of their relationship, and has probative force in establishing their conduct towards each other.

"Distinct, independent, substantive offenses, not related to the one charged, committed at different times or different places, cannot be shown against the defendant, but not so when the time, the place, the circumstances and the parties all have some relation to and are directly involved in the act charged at the time of its commission, or immediately before or after; and we think this is the doctrine of the cases cited."

On analysis, this asserts that the testimony is not within the rule which excludes distinct, independent, substantive offenses not related to the one charged, and committed at different times and different places, and unrelated to the offense charged, because:

1. The acts are all so closely related in point of time and place and so intimately associated with each other that they form one continuous transaction.

2. What immediately precedes or follows the act complained of is admissible for the purpose of showing the *scienter* or *quo animo* of the party charged.

3. The rule does not apply when the time, place or circumstances and the parties all have some relation to and are directly involved in the act charged at the time of its commission, or immediately before or after.

4. Every fact or circumstance surrounding the parties or attending their actions, from the time of meeting to the separation, is material to a proper understanding of their relationship.

5. Every fact and circumstance surrounding the parties or attendant upon their action from the first meeting to final separation is not only material to a proper understanding of their relationship, but has probative force in establishing their conduct towards each other.

III. a. The effect of conduct immediately preceding the act charged is not in the case, because all the acts involved in this testimony were committed subsequent to such act.

b. None of the testimony can be defended on the ground that it tends to show *scienter* or the animus of defendant. The exception which permits acts not charged to be introduced for that purpose is merely a recognition of the fact that when the purpose and intent with which an unlawful act was committed is under investigation, similar acts committed by the same person at other times have probative force. Thus, on a charge of obtaining property by false pretenses, that defendant had made other false pretenses,— and, more strongly, of course, if he knew when he made such other pretenses that they were false,—tends to show he did not innocently or mistakenly make the pretense indicted for. Such evidence is rightly admitted because it makes it more likely he made the pretense at bar with fraudulent intent. Manifestly, this reason for letting in evidence of other acts has no place here. That which must be done to constitute rape, of itself, supplies proof of *scienter* and indicates the animus of the assailant. No question can arise on whether a ravishment may not be due to accident or mistake, or have been accomplished without evil intent. It is clear this testimony should not have been, and was not, received on *this* theory.

c. While it is true that the exception may not be applied unless the elements referred to by the majority are present, it does not follow that it may be applied if the things so referred to do appear but stand alone. I do not believe that even if the acts are closely related in point of time and place, are so intimately associated as to form one continuous transaction, and have relation to and are directly involved in "the act charged at the time of its commission," or immediately after, this will alone base the exception. Nor can I agree that any or every act or circumstance surrounding the parties or attending their actions, from the time of meeting to

separation, is of necessity material to a proper understanding of their relationship, or necessarily material for any purpose. The true rule, as I conceive it, is this: While closely related acts, steps creating one continuous transaction, and all matters relating to, and directly involved in the act charged, and all facts and circumstances surrounding the parties or attending their actions may be admissible, though not acts charged in the indictment, and though such acts are inadmissible if these elements are absent, they may remain inadmissible even though these elements do appear, and their admissibility does not depend so much upon what they are related to or attendant on as upon what they prove concerning the act charged. If the rule is as broad as the majority asserts, it would be proper to show that it hailed immediately after the rape was accomplished; or that the man had no shoes on while committing the crime; or that while engaged in it, he shouted approval of the beating of a horse, which was occurring in his sight; or that he left his victim for a few minutes and went to a neighboring house and there committed a murder, upon which he immediately returned, and again assaulted prosecutrix.

That the subsequent acts at bar were related to the crime charged must be conceded. They were related, in the sense that they are of a character akin to the act charged; that they are all directed to the prosecutrix; that defendant was in some way a participant, and that all were done in the same neighborhood and on the same day. But if defendant had met prosecutrix at different hours of the same day and at different places and ravished her at each meeting, every element relied on by the majority would be present; and the relationship to the main act, both as to the character of the subsequent acts and as to parties, would be even more clearly made out than is done by the subsequent acts testified to here. But would that have warranted proof of the acts of rape subsequent to the act charged?

On the other hand, if a stranger had, shortly before

the ravishment, struck the woman a savage blow upon the head with a heavy club, evidence of this would be admissible, though a distinct crime committed without defendant's knowledge or co-operation, because it bears on the physical condition of the victim subsequently ravished, with reference to her capacity to make resistance. And so if, after the ravishment, and while the woman was attempting to reach some of her friends, a stranger had abducted her, keeping her for several days, evidence of this act would be admissible because it would explain the failure to make immediate complaint.

If a man in the very act of ravishing a woman should employ one hand in a robbery by violently taking a pocket-book attached to the person of his victim, the act would be intimately related to the ravishment in point of time and place, and would be a part of the transaction in the sense that it occurred during the very time and between the very parties, and involved another crime of violence committed by one upon the other. But it would not be claimed that evidence of this robbery is admissible. It would not be, because, while it meets the other standards, it has absolutely no probative weight on whether the intercourse was accomplished in such manner as to constitute rape, or, for that matter, on whether defendant was guilty of anything but the robbery.

Enough has been said to indicate what I conceive to be the vice of the opinion. While it holds rightly that there must be intimate relationship, both in matter and as to time and place, it errs in holding that this alone suffices, without reference to whether the act thus related has probative bearing on whether defendant raped prosecutrix, as charged. It also errs in holding that the acts in question had such probative value. True, the conduct in question tends to show that the defendant is a man of the worst moral tendencies and of a very low type, and thus furnishes some evidence that he is more likely to commit a rape than a better man would be. But that affords no basis for applying the exception, because in nearly every instance in which other acts

are excluded, they would, if admitted, tend to show that the
defendant was one more likely to commit the act charged
than a better man would be.   If this defendant had in his
past committed murder and incest and been guilty of numer-
ous seductions, it is clear that proof thereof would tend to
show that he had a disposition and record which made it no
sudden departure from his standards to commit rape.   But,
of course, such testimony would not be admissible for such
purpose.   This squarely presents the essential error in the
opinion.   Concede that these subsequent acts were by the
procurement of the defendant; concede that this shows him
to be capable of committing rape; concede that they have
relationship to the main act in point of time and place;
concede that they were of the same nature, and that they
began when the main offense ended,—in what way are they
relevant?   In what way do they tend to establish the charge
in the indictment that this defendant himself raped this
prosecutrix, an act which, under the proof, he committed
before any of the other acts were done?   In what way are
the subsequent acts "involved" in the prior rape "at the
time of its commission?"   How do they show "one continuous
transaction?"   How do they help to a proper understanding
of the relationship between defendant and prosecutrix or
"establish their conduct towards each other?"   In what way
do they competently tend to show that the rape charged was
committed?   Suppose the defendant did procure, shortly after
assaulting the prosecutrix, the rape of her by others, how does
that prove that he had connection with her against her utter-
most resistance?   This testimony is so far from being proof
of the charge as that, if defendant had sought to introduce
same and it had been refused, there would be a more serious
question.   For, so far from proving that prosecutrix yielded
after the utmost resistance she was capable of, it tends to indi-
cate that, on the contrary, nothing had occurred between her
and the defendant which angered her or created a desire
to flee from him, and it indicates, also, that she is one unlikely

to make resistance. In other words, so far from proving that the defendant did what the law defines to be rape, it indicates, rather, that whatsoever he did was with the consent of the prosecutrix. Now, anticipating that it may be said that since the testimony had this tendency the defendant was not prejudiced, I have to say that, while this may be true theoretically, it is manifest that the direct and natural effect of this testimony was to anger the jury by the exhibiting of conduct so utterly reprehensible as that the presenting of it in testimony, beyond all question, inclined the jury more strongly to find guilt as to the main charge than it would otherwise have been. If testimony had been admitted that, for a year before and up to the time of the alleged ravishment, the defendant had lived upon the earnings of the prosecutrix as a prostitute, in theory, this would be strong argument to the jury that defendant did not have to use force to obtain intercourse, and, therefore, did not use it. Yet there can be no question that exhibiting him as a parasite, living upon the sale of the woman's body, would make the average jury much more ready to convict for rape, or anything else that might be charged.

In *State v. Hogan*, 145 Iowa at 354, the evidence tended strongly to show concerted action between one Rohn, Hausler, and the defendant, that each in turn committed the crime, the defendant being last. The crimes were committed in his barn. The three were together at the barn shortly after the offense was committed by Rohn, at the time it was committed by defendant, and for some hours thereafter. Rohn had procured the presence of the prosecutrix at the barn, and before the trial of the defendant, Rohn had been convicted of his offense.

Some hours later in the day, in another place, not far away, defendant again committed the offense. The State introduced its evidence concerning both of the alleged acts on the part of defendant, and at the close elected to rely upon the last. *Hogan's* case merely says that the act of Rohn was

not separate and independent from that of defendant, but "was so connected and related to the acts of the defendant that it was admissible as one of the surrounding circumstances of the case." No argument beyond these quoted words is attempted, and, of course, these cannot be said to be more than the assertion of a naked conclusion. To appreciate how little real consideration was given to the question, it may be pointed out that the only citation in support is *State v. O'Connell*, 144 Iowa 559, wherein an exception, which all concede to exist, was applied: to wit, that on the charge of uttering an instrument on which defendant had forged an indorsement, evidence tending to prove another crime is admissible for the purpose of showing guilty and fraudulent intent on part of the one charged. Aside from this, there is reasonable ground for distinguishing the case at bar from the *Hogan* case. Its essence is that where one man procures the victim, and he and the defendant thereupon proceed to ravish her by concerted action, and the defendant again uses the opportunity originally created by the first procurer, then the acts constituting the procurement are admissible. The difference between this and the testimony at bar is that the first does show acts related probatively to the act charged; while in the last, the acts are connected in point of time and place, and are in a sort of a logical relation, but yet have no probative value as to the act charged. It is one thing to prove against one who committed a rape that he accepted the help of another with whom he joined in the crime, and used the opportunity first provided by the accomplice to repeat the act and so connect with the act elected for prosecution. It is quite another to admit proof of rape committed with the connivance of the defendant after his own act had been completed. The first is not merely taking evidence of an independent offense, but is also proof of methods employed to obtain the criminal intercourse. The testimony at bar proves merely that the defendant procured the defilement of a woman whom he had already ravished. Regarding the *Hogan* decision

as I do, I have no occasion to indicate what I might deem my duty in the premises were it a ruling that substantially what was done in this case is not error.

There are those who will simply assume that this defendant is guilty of rape and urge that, therefore, there should be no straining at the methods that brought about his punishment. The execution on order of Judge Lynch is always excused with the assertion that justice has been accomplished even though the law was violated in the accomplishment. This line of reasoning should not appeal to a court of last resort. But bad as it would be to entertain such insistence, worse is involved in sustaining the taking of this testimony. The servants of the law should not permit a *guilty* man to lose a single right which the law gives him. If this can be doubted, it at least is not doubtful that no infraction of the rules of evidence should be permitted to the harm of one who is presumed to be innocent. If *lex talionis* may prevail as to those who are guilty, even that is no warrant for disregarding the law in such manner that juries may be influenced into finding an innocent man guilty. When this testimony was taken, the presumption of innocence still obtained. Desire to be sure that none guilty shall escape does not warrant the doing of what may unduly bring about a verdict of guilt. The oath of the judge should restrain us from even considering whether and how far we should be tolerant of what was done to bring about the punishment of the perpetrator of an atrocious crime. What we have for review is whether an innocent man may not have suffered a denial of rights guaranteed to him by the law of the land, by and through the introduction of testimony which, of necessity, must have been highly inflammatory and calculated to be an advocacy of his conviction on general principles.

I agree to the conclusion reached but would reverse, also, because this testimony was admitted.